IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **VANESSA THARP**, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>**DELTA AIR LINES, INC.**, a Delaware corporation,<br><br>        Defendant. | Case No. 3:20-cv-00258-IM<br><br>**OPINION AND ORDER** |

James T. Anderson, James Nathan Bingham, Krutch Lindell Bingham Jones, P.S., 3316 Fuhrman Ave. E, Suite 250, Seattle, WA 98102; Matthew K. Clarke, Krutch Lindell Bingham Jones, P.S., 5 Centerpoint Drive, Suite 400, Lake Oswego, OR 97035; Patrick T. Foran, Wyse Kadish LLP, 900 SW Fifth Ave., Suite 2000, Portland, OR 97204. Attorneys for Plaintiff.

Caryn Geraghty Jorgensen, John Thomas Fetters, Brett T. MacIntyre, Stokes Lawrence, P.S., 1420 5th Ave., Suite 3000, Seattle, WA 98101. Attorneys for Defendant.

**IMMERGUT, District Judge.**

        This case involves an incident which occurred on a Delta Air Lines flight from Los Angeles, California, to Portland, Oregon. Plaintiff Vanessa Tharp seeks to hold Defendant Delta Air Lines strictly liable under the Montreal Convention[1] for injuries she allegedly incurred from

---

[1] Convention for Int'l Carriage by Air, May 28, 1999, S. Treaty Doc No. 106-45 [hereinafter "Montreal Convention" or "Convention"].

an assault by another passenger aboard the flight. Before this Court are two motions for summary judgment, one filed by Plaintiff, ECF 26, and one by Defendant, ECF 28. Both motions address the applicability of the Montreal Convention's strict liability provision to this case. Specifically, the motions dispute whether Plaintiff can establish two elements required to trigger air carrier liability under the Montreal Convention: (1) that the alleged assault qualifies as an "accident"; and (2) that Plaintiff sustained a "bodily injury."

As explained further below, this Court finds that no rational trier of fact could find that Plaintiff sustained a "bodily injury" within the meaning of the Montreal Convention from the alleged assault. Because this deficiency is fatal to Plaintiff's claim, this Court declines to address whether the alleged assault qualifies as an "accident" under the Montreal Convention. Accordingly, Plaintiff's Motion for Summary Judgment, ECF 26, is DENIED, and Defendant's Motion for Summary Judgment, ECF 28, is GRANTED.

## LEGAL STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255

(1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt as to the material facts" at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

**Joint Statement of Agreed Facts**

The following facts are taken from the Joint Statement of Agreed Facts, ECF 25, submitted by the Parties. While Plaintiff disputes the relevance of some of the selected facts included below, no party contests their veracity. *See generally id.*

On August 30, 2019, Plaintiff traveled on Delta Flight 748, a flight from Los Angeles, California (LAX) to Portland, Oregon (PDX). *Id.* at ¶ 1. The flight was part of Plaintiff's return travel from Mexico City to Portland. *Id.*

The aircraft used for Flight 748 was a Boeing 757-200, with three seats on either side of a single aisle in the Comfort Plus and main cabin sections denoted by aisle number and ABC/DEF lettering. *Id.* at ¶ 2. Plaintiff was assigned to seat 15F, a window seat in Delta's Comfort Plus section. *Id.* at ¶ 3. Plaintiff initially sat in her assigned seat. *Id.* Both 15D and 15E, the seats immediately next to Plaintiff, were occupied. *Id.*

Before takeoff, Plaintiff moved to an open window seat across the aisle, seat 15A. *Id.* Seat 15B, the seat immediately next to 15A, was and remained empty for the flight. *Id.* The flight had numerous open seats and Plaintiff moved to 15A so that she could have extra space. *Id.*

A passenger named Robert "Bob" Gray was sitting in seat 15C, the aisle seat nearest seat 15A. *Id.* at ¶ 4. Plaintiff did not recall observing anything noteworthy about Gray before she moved to seat 15A. *Id.* After Plaintiff sat in 15A, Gray almost immediately initiated a conversation. *Id.* at ¶ 5. Plaintiff perceived that Gray was attempting to flirt with her. *Id.* Plaintiff did not reciprocate what she perceived to be Gray's attempts at flirting and attempted to mind her own business. *Id.* Plaintiff later reported to the Port of Portland Police that Gray was "weird" or "socially awkward" and said she responded to Gray's conversation attempts with short, simple responses. *Id.* at ¶ 9. Plaintiff attempted to disengage from the conversation by putting in her headphones, turning her body away, and watching a TV show on the in-flight entertainment system. *Id.* at ¶ 14.

PAGE 4 – OPINION AND ORDER

Plaintiff made eye contact with one of the flight attendants as the flight attendant walked the aisle. *Id*. at ¶ 15. The flight attendant mouthed "are you okay?" and Plaintiff responded by nodding "yes." *Id*.

Despite Plaintiff's efforts to end the interaction, Gray reached across the empty middle seat approximately three dozen times during the flight, touching Plaintiff on her right arm. *Id*. at ¶ 16. Plaintiff alleges that at three distinct points during their interaction, Gray's hand touched her right breast. *Id*. Plaintiff told Officer Jared Schuurmans of the Port of Portland Police Department that Gray would look out the window and point at various things like the sunset or the Golden Gate Bridge as an "excuse" to get the back of his hand near her breasts. *Id*.

Plaintiff is not aware of anyone from Delta who observed Gray touch her inappropriately at any time during the flight. *Id*. at ¶ 18.

During the flight, Plaintiff attempted to send text messages to a friend via the plane's WiFi. *Id*. at ¶ 21. The text messages did not go through until after the flight landed due to connectivity issues, but Plaintiff provided the messages to law enforcement and acknowledged that she had drafted them at some point during the flight. *Id*. In her text messages, Plaintiff wrote: "As he taps me he also kind of touches my boob.. umm.. I don't think he meant to, just clearly a perk of this seat and lovely interaction… Or his pot pretzels and loss of motor skills…" *Id*.

Plaintiff eventually stood up and went to the back of the plane, where she spoke with three of the Delta flight attendants about Gray's behavior. *Id*. at ¶ 22.[2] Plaintiff remained in the

---

[2] Because Plaintiff disputes the description of her conversation with the flight attendants provided in the Joint Statement of Agreed Facts, it has been excluded from this section. *See id*. at ¶ 23 n.10, ¶¶ 26–27 nn.13–14. In support of its summary judgment motion, Defendant submitted evidence regarding the substance of this conversation which is described in the "Defendant's Evidence" section below.

back of the plane with the flight attendants for between 45 minutes and an hour. *Id*. at ¶ 28. Before Plaintiff returned to her seat, the flight attendants told her to push the call button to get their attention if she needed further assistance or felt uncomfortable and they would respond right away. *Id*. at ¶ 29.

Plaintiff returned to seat 15A as the flight was about to start its descent into Portland. *Id*. At the time, Plaintiff's originally assigned seat, 15F, was open. *Id*. at ¶ 28. Plaintiff did not ring the call button. *Id*. at 29.

After Plaintiff returned to seat 15A the flight attendants walked by, making eye contact with Plaintiff to check in with her. *Id*. at ¶ 30.

Delta's flight crew arranged for a customer services specialist to meet Plaintiff when the flight landed in Portland. *Id*. at ¶ 33. Plaintiff spoke with the representative about what happened on the flight and the representative provided her with a phone number to call if she wanted to make a formal complaint with Delta. *Id*. Plaintiff recalls being in tears and embarrassed during this conversation because it took place in front of the other passengers as they disembarked the aircraft. *Id*.

In her text messages during the flight, Plaintiff wrote that she was "[g]rateful the flight attendants were super supportive." *Id*. at ¶ 34. In a public Facebook post the day after the flight, Plaintiff wrote that "[o]nce aware, my full hats off and gratitude to the Delta Air Lines staff who were extremely accommodating, helpful, and would have moved me, him, or even had handcuffs waiting for him upon arrival." *Id*. During her deposition, Plaintiff testified that Delta's flight attendants "were kind and they listened to me and they apologized and they were supportive." *Id*. Also during her deposition, Plaintiff testified that Delta's flight attendants "intensif[ied] the trauma" she experienced by presenting her with the choice of moving seats, having Gray move

PAGE 6 – OPINION AND ORDER

seats, or calling law enforcement—alleging that she would have preferred that the Delta flight attendants make the decision for her. *Id*. at ¶ 35.

At the airport, Plaintiff spoke with Officer Jesse Layman of the Port of Portland Police Department near the Tri-Met Platform. *Id*. at ¶ 36. Plaintiff asked Officer Layman to escort her to the rideshare location. *Id*.

Plaintiff did not seek medical attention for any physical injury from the incident. *Id*. at ¶ 39. The alleged touching did not result in any cuts, lacerations, or bleeding. *Id*.

**Plaintiff's Evidence**

Plaintiff submitted a personally written declaration from March 29, 2021 in support of her summary judgment motion. Tharp Decl., ECF 27. In her declaration, Plaintiff alleges that Gray was "impaired by drugs and/or alcohol" during the flight. *Id*. at ¶ 4.

Plaintiff alleges that Gray "slapped [her] arm numerous times and touched [her] breast on three distinct occasions." *Id*. at ¶ 8. Plaintiff concedes that these contacts "did not cause lasting injuries," but claims that "many of the slaps on my arm were painful when they occurred, and they were significant enough to cause irritation and redness on my skin that lasted for hours after the flight." *Id*. at ¶ 9. Plaintiff asserts that she "found the series of physical contacts to be frightening, offensive, uncomfortable, and physically painful." *Id*.

**Defendant's Evidence**

In support of its summary judgment motion, Defendant submitted excerpts from a deposition taken of Plaintiff, declarations from flight attendants who were on the flight, and declarations from police officers who investigated the incident. MacIntyre Decl., ECF 29 (deposition); Ritschard Decl., ECF 30 (police); Campbell Decl., ECF 31 (flight attendant); Free

Declaration, ECF 32 (flight attendant); Schuurmans Decl., ECF 33 (police); Layman Decl., ECF 34 (police).

With regard to the physical contact between Gray and Plaintiff, the declarations indicate that Plaintiff reported to investigating police officers that Gray had reached out and "touched" her arm with the back of his fingers and hand every time he wanted to get her attention. Ritschard Decl., ECF 30 at ¶ 9; Schuurmans Decl., ECF 33 at ¶ 7. Plaintiff allegedly described the touching as "possibly a nervous tick." Ritschard Decl., ECF 30 at ¶ 9. Plaintiff also told police that, at three distinct points during their interaction, Gray's hand touched her right breast with the back of his hand. *Id.* at ¶ 8; Schuurmans Decl., ECF 33 at ¶ 8. Plaintiff reported that Gray "brushed against" her breast with the back of his hand while pointing out the window at the Golden Gate Bridge. Ritschard Decl., ECF 30 at ¶ 8; Schuurmans Decl., ECF 33 at ¶ 8.

The declarations from the flight attendants report that when Plaintiff went to the back of the plane to speak with them about Gray's behavior, she told them that Gray had been chatting with her during the flight and he touched her arm during conversation. Free Decl., ECF 32 at ¶ 3. Plaintiff told one of the flight attendants that she became uncomfortable when Gray touched her arm and his hand passed beside her breast. *Id.*

The flight attendants reported that they told Plaintiff she could move seats, including to another Comfort Plus seat or any of the entirely empty rows in the rear of the plane, but Plaintiff declined, saying that she did not want to give up the benefits of the Comfort Plus section she was sitting in. *Id.* at ¶ 5; Campbell Decl., ECF 31 at ¶ 5. The flight attendants told Plaintiff they would honor her Comfort Plus status even if she moved to a regular coach seat and offered to gather her personal belongings for her so that she did not have to return to row 15. Free Decl., ECF 32 at ¶ 7; Campbell Decl., ECF 31 at ¶ 5. Plaintiff declined. *Id.* One flight attendant

PAGE 8 – OPINION AND ORDER

reported that he also offered to relocate Gray or to have law enforcement meet the aircraft when it landed in Portland, but Plaintiff declined those options as well. Campbell Decl., ECF 31 at ¶¶ 6, 8. Plaintiff allegedly said that she did not want anything to happen to Gray and that she just wanted the flight attendants to be aware of the situation. *Id*. at ¶ 8. The flight attendants allegedly encouraged Plaintiff to take any of the open seats on the plane, but she instead chose to return to seat 15A. Free Decl., ECF 32 at ¶ 9. The flight attendants checked on Plaintiff after she returned to seat 15A. Campbell Decl., ECF 31 at ¶ 10; Free Decl., ECF 32 at ¶ 11. One flight attendant reported that Plaintiff gave her a thumbs up to indicate that she was okay. Free Decl., ECF 32 at ¶ 11.

As Plaintiff was leaving the airport, she approached Officer Jesse Layman of the Port of Portland Police Department near baggage claim. Layman Decl., ECF 34 at ¶ 2. Plaintiff asked Officer Layman for an escort to the rideshare area because there was a "creeper." *Id*. When Officer Layman asked Plaintiff if she needed to file a police report about anything, Plaintiff declined, saying "[h]e was just a creeper and I reported it to the airline, and they took care of it." *Id*. at ¶ 3.

In her deposition, Plaintiff reported that she did not recall any bruising as a result of the alleged contact, even though she said she bruises easily. MacIntyre Decl., ECF 29, Ex. A at 58:14–23.

## DISCUSSION

### A. The Montreal Convention

The Montreal Convention is a multilateral treaty, ratified in 1999, which "provides the exclusive remedy for international passengers seeking damages against airline carriers."

*Narayanan v. Brit. Airways*, 747 F.3d 1125, 1127 (9th Cir. 2014).[3] For signatory nations, the Montreal Convention replaced the 1929 Warsaw Convention. *Id.* at 1127 n.2. Under Article 17 of the Convention, air carriers are "liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, art. 17(1). The Convention states that for damages arising under Article 17(1) "not exceeding 100,000 Special Drawing Rights for each passenger, the carrier shall not be able to exclude or limit its liability." *Id.* at art. 21(1). Taken together, Articles 17 and 21 require that a plaintiff seeking to hold an airline strictly liable under the Montreal Convention must establish both that an "accident" occurred, and that it resulted in "death or bodily injury."

The language in Article 17 of the Montreal Convention, including the use of the terms "accident" and "bodily injury," is substantially similar to Article 17 of the Warsaw Convention.[4] Despite the provisions' similarities, Plaintiff argues in her briefing, citing no authority, that this Court should "view the Montreal Convention as an entirely new treaty and completely disregard

---

[3] Although the incident at issue here occurred on a domestic flight from Los Angeles to Portland, Plaintiff was traveling on Flight 748 as part of an international itinerary from Mexico City to Portland. Therefore, the Montreal Convention applies. *See Saegusa-Beecroft v. Hawaiian Airlines, Inc.*, No. 18-00384 HG-KJM, 2019 WL 1586744, at *3 (D. Haw. Apr. 12, 2019)) ("A domestic leg of an international trip may fall within and be covered by the Warsaw and Montreal Conventions when the initial place of departure is in a different country than the intended place of destination.").

[4] *Compare* Montreal Convention, art. 17 (emphasis added):
"The carrier is liable for damage sustained in case of death or *bodily injury* of a passenger upon condition only that the *accident* which caused the death or injury took place on board the aircraft or in the course of the operations of embarking or disembarking."

*with* Warsaw Convention, art. 17 (emphasis added):
"The carrier is liable for damage sustained in the event of the death or wounding of a passenger or any other *bodily injury* suffered by a passenger, if the *accident* which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

PAGE 10 – OPINION AND ORDER

the Warsaw Convention case law" interpreting the terms "accident" and "bodily injury." ECF 26 at 10; ECF 36 at 5. Plaintiff also asserts, again without citing any authority, that in interpreting claims brought under the Montreal Convention, "any ambiguity should be resolved in favor of the passenger – not the airline." ECF 26 at 11.

The Ninth Circuit, however, has explained that because "the Montreal Convention incorporates many of [the Warsaw Convention's] substantive provisions[,] . . . courts have routinely relied upon Warsaw Convention precedent where the equivalent provision in the Montreal Convention is substantially the same." *Narayanan*, 747 F.3d at 1127 n.2 (internal citations omitted).

Courts both within the Ninth Circuit and nationwide routinely apply precedent interpreting the terms "accident" and "bodily injury" in Article 17 of the Warsaw Convention to cases brought under Article 17 of the Montreal Convention. *See e.g.*, *Phifer v. Icelandair*, 652 F.3d 1222, 1223 (9th Cir. 2011) (adopting the Supreme Court's definition of "accident" as articulated in *Air France v. Saks*, 470 U.S. 392, 405 (1985), a case decided under the Warsaw Convention, into its analysis of the same term in Article 17 of the Montreal Convention), *as amended on denial of reh'g* (Sept. 1, 2011); *Patel v. Singapore Airlines Ltd.*, 745 F. App'x. 9, 11 (9th Cir. 2018) (citing *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535–36 (1991), a case decided under the Warsaw Convention, when laying out the requirements for what plaintiff must show under the Montreal Convention to establish liability under Article 17); *Heinemann v. United Cont'l Airlines*, No. 2:11-CV-00002-MJP, 2011 WL 2144603, at *3 (W.D. Wash. May 31, 2011) (stating that the Montreal Convention "is identical to the Warsaw Convention in many respects (including the language which is relevant to this case; i.e., Article 17)"); *Dogbe v. Delta Air Lines Inc.*, 969 F. Supp. 2d 261, 271 (E.D.N.Y. 2013) ("In light of the substantial parity of

Article 17 in each convention, the court will . . . look to precedent interpreting Article 17 of both conventions."). In line with Ninth Circuit precedent, this Court rejects Plaintiff's argument to "completely disregard" Warsaw Convention case law in interpreting Article 17 of the Montreal Convention.

### 1. "Bodily injury" under Article 17

To bring a claim for strict liability under the Montreal Convention, a plaintiff must establish that she suffered "death or bodily injury." The phrase "bodily injury" as used in Article 17 carries "a narrow meaning excluding purely mental injurie[s]," meaning that "an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury." *Floyd*, 499 U.S. at 542, 552 (interpreting Warsaw Convention). In *Floyd*, the Supreme Court explained that an inquiry into the meaning of the term "bodily injury" as used in Article 17 is not based on general principles found in other areas of law, but on the original French text of the Warsaw Convention supplemented by "the history of the treaty, the negotiations, and the practical construction adopted by the parties." 499 U.S. at 534–35 (citation and quotation marks omitted). The Supreme Court has also determined that Article 17 does not permit recovery for injuries that are "solely psychic or psychosomatic." *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 172 (1999).

District courts in the Ninth Circuit routinely rely on Warsaw Convention cases in interpreting the Montreal Convention's "bodily injury" requirement. *See e.g.*, *Seshadri v. Brit. Airways PLC*, No. 3:14-cv-00833-BAS (WVG), 2014 WL 5606542, at *9 (S.D. Cal. Nov. 4, 2014) (citing *Floyd* in its interpretation of Article 17's "bodily injury requirement" in the Montreal Convention); *Smith v. Am. Airlines, Inc.*, No. C 09-02903 WHA, 2009 WL 3072449, at *5 (N.D. Cal. Sept. 22, 2009) (same).

PAGE 12 – OPINION AND ORDER

Courts both within and outside the Ninth Circuit have ruled that to establish a "bodily injury," plaintiffs must present proof of an objective and identifiable injury to the body. *See Heinemann*, 2011 WL 2144603, at *4; *Salis v. Ghana Airways*, 780 N.Y.S.2d 627, 629 (N.Y. App. Div. 2004); *Rosman v. Trans World Airlines, Inc.*, 314 N.E.2d 848, 855–56 (N.Y. 1974) (explaining that "the ordinary, natural meaning of 'bodily injury' as used in article 17 connotes palpable, conspicuous physical injury" and a "claim must therefore be predicated upon some objective identifiable injury to the body"). This rule has been applied in cases involving sexual assault. *See Doe v. United Air Lines, Inc.*, 73 Cal. Rptr. 3d 541, 552 (Cal. Ct. App. 2008) ("Nothing in the language of Article 17 suggests that a passenger may recover for physical contact, however offensive, that does not result in *some* bodily injury." (emphasis in original)).

In *Doe v. United Air Lines*, the California Court of Appeals affirmed the lower court's grant of summary judgment in favor of the defendant airline because the plaintiff could not establish that the sexual assault she allegedly suffered while aboard a flight resulted in "bodily injury." 73 Cal. Rptr. 3d at 546–553. The plaintiff in *Doe* conceded during her deposition that the sexual assault she experienced did not result in any cuts, bleeding, or bruises of any kind. *Id.* at 547. While the plaintiff contended that the question of whether her assaulter's conduct had physically injured her remained a triable issue, the court noted that none of the evidence she submitted contradicted her deposition testimony. *Id*. Given the lack of evidence of any objectively identifiable physical injury resulting from the assault, the appellate court affirmed the trial court's initial grant of summary judgment for the defendant airline. *Id.* at 552

Here, like in *Doe,* Plaintiff conceded in her deposition that she did not recall any bruising resulting from Gray's contact with her, even though she said she bruises easily. MacIntyre Decl., ECF 29, Ex. A at 58:14–23. Specifically, when asked if Gray's physical contact resulted in any

PAGE 13 – OPINION AND ORDER

bruises, Plaintiff responded, "I don't remember." *Id.* Plaintiff further acknowledges that she did not seek medical attention for any physical injury from the incident. ECF 25 at ¶ 39. Evidence submitted by Defendant indicates that Plaintiff described Gray's physical contact with her to flight attendants during the flight and law enforcement shortly afterwards using terms like "touched" and "brushed against." Ritschard Decl., ECF 30 at ¶¶ 8–9; Schuurmans Decl., ECF 33 at ¶ 8; Free Decl., ECF 32 at ¶ 3. Plaintiff also allegedly described the touching to law enforcement as "possibly a nervous tick." Ritschard Decl., ECF 30 at ¶ 9. In the text messages Plaintiff wrote during the flight she characterized the contacts as "taps." ECF 25 at ¶ 21.

While Plaintiff has submitted a declaration in which she claims that Gray "slapped [her] arm numerous times" and that "many of the slaps . . . were painful" and "were significant enough to cause irritation and redness on my skin that lasted for hours after the flight," ECF 27 at ¶¶ 8–9, she cites no other evidence suggesting that an objective, identifiable injury resulted from her contact with Gray. The Port of Portland patrol officer who took Plaintiff's report after she arrived in Portland submitted a declaration asserting that Plaintiff "did not use the words 'slap' or 'hit' when describing the touching" and that Plaintiff did not report any injuries. Schuurmans Decl., ECF 33 at ¶ 7. Detective Ritschard, the detective who investigated this incident and interviewed Plaintiff, also submitted a declaration which states that at no point did Plaintiff ever use the word "hit" or "slap" when describing the incident, nor did Plaintiff report any physical injuries. ECF 30 at ¶ 13. Because of lack of proof of physical injury, Detective Ritschard investigated the incident as Harassment (O.R.S. § 166.065) rather than Assault in the Fourth Degree (O.R.S. § 163.160), a crime that requires proof of physical injury. *Id.* at ¶ 15.

On this record, this Court finds that Plaintiff did not suffer a "bodily injury" under Article 17 of the Montreal Convention. While there may arguably be a dispute of fact over the nature of

the contact that Plaintiff endured on the plane (*i.e.*, "taps" vs. "slaps"), Plaintiff herself admits that contact "did not cause lasting injuries," Tharp Decl., ECF 27 at ¶ 9, and offers no evidence of a physical injury resulting from the event other than her unsubstantiated claim that the contact to her arm caused "irritation and redness" on her skin that "lasted for hours after the flight," *id.*. To survive summary judgment, Plaintiff must demonstrate that there is a genuine issue of material fact as to whether this incident resulted in an objective and identifiable injury to her body. *See* Fed. R. Civ. P. 56(a); *Salis*, 780 N.Y.S.2d 627, 629. In a motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (citation and quotation marks omitted).

      The question asked at summary judgment is if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented," meaning that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find" for the nonmoving party. *Liberty Lobby*, 477 U.S. at 252. In considering Defendant's summary judgment motion, this Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* Based on the evidence presented, this Court concludes that no reasonable trier of fact could conclude that Plaintiff suffered a "bodily injury" under Article 17 of the Montreal Convention from this incident. Plaintiff's uncorroborated assertion that her skin was red for a few hours after the flight is no more than a "mere scintilla" of evidence in support of the existence of an objective, identifiable bodily injury resulting from the incident on

the plane. Because there is no genuine dispute over the dispositive fact that Plaintiff suffered no bodily injury from the alleged assault, Plaintiff's claim fails.

Plaintiff argues, as an alternative to the standard articulated in *Floyd* and its progeny, that "any sort of physical pain or discomfort satisfies the plain language of the treaty" and therefore that she does not need to show an objective, identifiable injury to her body to recover under the Montreal Convention. ECF 26 at 16. Plaintiff almost exclusively relies on *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406 (6th Cir. 2017) to support the notion that a bodily injury does not need to reach any degree of severity before it is actionable. *Id*. In *Etihad*, the Sixth Circuit found in favor of a plaintiff who pricked her finger on a hypodermic needle that had been left in a seatback pocket. 870 F.3d at 409. Plaintiff argues that *Etihad* demonstrates an instance in which a court applied the Montreal Convention even when there was no lasting physiological injury. ECF 26 at 16. However, as Defendant points out, "bodily injury" was not the issue in *Etihad*, as both parties stipulated that the incident qualified as both an "accident" and a "bodily injury." ECF 35 at 17 (citing *Etihad*, 870 F.3d at 409). The sole issue before the *Etihad* court was whether the plaintiff could recover for mental-anguish and emotional-distress damages related to the stipulated physical injury, as the parties had already reached a settlement as to the *de minimus* damages related to the physical pain, suffering, and medical expenses caused by the prick on the plaintiff's finger. 870 F.3d at 410–11. Therefore, *Etihad* is not instructive on the issue of how the term "bodily injury" should be interpreted under Article 17 and does not alter this Court's conclusion.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment, ECF 26, is DENIED, Defendant's Motion for Summary Judgment, ECF 28, is GRANTED, and this case is DISMISSED.

**IT IS SO ORDERED**.

DATED this 3rd day of August, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge